J-S52038-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DAVID ALLEN BURROWS | |
| Appellant | No. 332 WDA 2015 |

Appeal from the Judgment of Sentence entered on January 29, 2015
In the Court of Common Pleas of Erie County
Criminal Division at No.: CP-25-CR-0003203-2013

BEFORE: SHOGAN, J., OLSON, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                         **FILED NOVEMBER 12, 2015**

David Allen Burrows appeals his January 29, 2015 judgment of sentence. Burrows' counsel, appointed for appellate purposes after Burrows' trial counsel was granted leave to withdraw at Burrows' request, has filed a petition to withdraw as counsel, together with an "***Anders***/***Santiago*** brief."[1] Burrows' counsel has satisfied the ***Anders***/***Santiago*** requirements. We agree with counsel that Burrows has no meritorious issues to pursue on appeal. Consequently, we grant counsel's petition to withdraw, and we affirm Burrows' judgment of sentence.

---

[1] ***See Anders v. California***, 386 U.S. 738 (1967); ***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009). In ***Santiago***, our Supreme Court developed certain rules to ensure compliance with the principles underlying ***Anders***. Thus, this Court commonly refers to briefs filed thereunder as "***Anders***/***Santiago*** briefs."

On or about October 1, 2013, Detective Jon Reddinger of the Erie County Detectives Bureau of the Erie County District Attorney's Office, assigned to the Erie County Elder Abuse Task Force, filed a criminal complaint with a sworn affidavit of probable cause against Burrows. In relevant part, the affidavit related the events underlying Burrows' charges as follows:

> Anne Brasington closed her PNC bank account on 10/10/2012 by obtaining a cashier's check for $9,334.61 to herself. This check was then endorsed by Ms. Brasington and Burrows and then deposited into Burrows' personal PNC checking account. Three checks were written from Burrows' checking account. One for $2,250 to Burrows and one for $6,334.61 to ABC Auto, which is Burrows' business. The third was to [Burrows] for $144. [Nick Monocello, an adult protective services worker for Greater Erie Community Action Committee ("GECAC"),] provided documentation of Ms. Brasington's account and surveillance photos of Burrows and Ms. Brasington in the bank at the time of the transaction. At the time of this allegation PNC had no documentation that Burrows had power of attorney over Brasington's affair or was her guardian.
>
> On 2/4/2013 the Erie Police responded to Ms. Brasington's residence where [she] had a complaint that someone had taken her car and she believed it was Burrows. A check of PENNDOT records show that Burrows, while using a power of attorney, sold the car to himself on 12/31/2012 and then sold it to another person on 2/4/2013 for $2500.00.
>
> On 7/28/2013 another [report of need ("RON")] was received after the Wesleyville Police Department went to the residence of Burrows from which Ms. Brasington called 911. Ms. Brasington state[d] that Burrows kept her locked in the house and that he was stealing her money. GECAC did another inquiry of Ms. Brasington's account and provided the findings to your affiant.
>
> During the investigation of the RON the following was discovered.

On 7/3/2013 Burrows brought a notary to the nursing home that Ms. Brasington was in and obtained a power of attorney document despite the nursing home's concern regarding Ms. Brasington's mental capacity. On 7/23/2013 Burrows moved Ms. Brasington into his residence at 3002 Rose Avenue in Wesleyville.

On 7/10/2013 the first suspicious activity happened in Ms. Brasington's PNC banking accounts. Burrows, using his power of attorney, transferred $2,500.00 from Ms. Brasington's savings to her checking. Burrows did this three more times. On 7/11/2013 Burrows transferred $2,161.37 from savings to checking. On 7/15/2013 Burrows transferred $2,500.00 from savings to checking. On 7/16/2013 Burrows transferred $2,500.00 from savings to checking. Finally on 7/18/2013 Burrows withdrew $5,000.06 from Ms. Brasington's savings account (closing the account) and deposited it into Brasington's checking account.

Burrows closed Ms. Brasington's saving account 8 days from the first report of activity.

Subsequently, Burrows wrote a check for $7,500 on 7/16/2013 to his business, ABC Auto, and two checks to himself, one for $3,500.00 on 7/17/2013 and one for $700.00 on 7/25/2013. On 7/23/2013 Burrows made a cash withdrawal from Ms. Brasington's checking account for $4,201.05. Burrows obtained $15,901.05 out of Ms. Brasington's account in 7 days.

On the same day Ms. Brasington moved into 3002 Rose Ave., July 23, 2013, Burrows wrote a check to himself for $2,637.45 with the note on the check "Taxes 3002 Rose Ave." and paid the 2012 taxes on 3002 Rose Avenue on 7/25/2013[,] where Ms. Brasington had lived for two days at the time of the payment. $2,673.45 was the cost of the taxes for Rose Ave. for 2012.

On 7/19/2013 a [$3,300] check was written from the account where the $3,500 check was deposited to Andy's Equipment with a note on the check "Pizza Oven & Donut Case."

Affidavit of Probable Cause. 10/1/2013, at 1-2 (minor modifications to grammar and nomenclature for clarity).

Burrows counsel provides the following account of this case:

On October 1, 2013, the Commonwealth charged [Burrows] with one count of Theft by Deception, 18 Pa.C.S. § 3922(a)(1) [count 1]; six counts of Theft by Unlawful Taking, 18 Pa.C.S. § 3921(a) [counts 2-6 and 9]; one count of Dealing in Proceeds of Unlawful Activities, 18 Pa.C.S. § 5111 [count 7]; and one count of Misapplication of Entrusted Property and Property of Government or Financial Institutions[,] 18 Pa.C.S. § 4113(a) [count 8]. These charges stemmed from allegations that, from October 10, 2012[,] through July 25, 2013, [Burrows] stole funds from an elderly, incompetent victim under the guise that he was caring for her, and used those stolen funds to purchase personal items through various sham accounts [that] he had opened.

\* \* \* \*

In its case-in-chief, the Commonwealth presented the testimony of a number of witnesses, including Monocello, an investigator for GECAC on allegations of abuse, abandonment, and exploitation of older adults 60 and above. Notes of Testimony Day 1, 11/12/2014 ("N.T.1."), at 45.[2] He further testified regarding the gathering of records for investigations, specifically for [Ms.] Brasington. *Id.* at 46.

Mr. Monocello testified that [Ms. Brasington] claimed that thousands of dollars had been stolen. *Id.* at 47. Thereafter[,] he contacted [Detective Reddinger] of the Erie County District Attorney's Office.

Next, Detective Reddinger testified regarding checks that [Burrows] wrote from [the] victim's checking account and deposited into four (4) claimed [personal and] business accounts of [Burrows]. *Id.* at 63. . . .

The next called witness was Vickie Wurst, Branch Service Manager, First Niagara Bank. *Id.* at 93. Ms. Wurst identified Ms. Brasington's account and David Burrows['] signature as Power of Attorney as well as previously identified checks. *Id.* at 98. . . .

_____

2   The trial spanned November 12, 13, and 14, 2014. For ease of reference, citations of trial testimony for each of the three days will be denoted, N.T.1, N.T.2, and N.T.3, respectively.

The Commonwealth then called Barbara J. Stevenson, a security officer for PNC Bank. *Id.* at 104. She simply identified [Burrows'] signature and business accounts as well as the amounts deposited there in which [*sic*] corresponded with previous checks signed by David Burrows as Power of Attorney out of [Ms.] Brasington's account.

* * * *

Carol McEwen was the next witness called by the Commonwealth. N.T.2 at 11. Ms. McEwen was a Social Services Director at Twinbrook Medical Center during June and July of 2013. *Id.* at 11. Twinbrook is a skilled nursing home.

Part of her duties include assessing patients who enter the facility. *Id.* at 12. Part of that assessment is mental and cognitive assessment. *Id.* at 12.

Ms. McEwen assessed [Ms. Brasington] on July 1, 2013. *Id.* at 14. Her assessment concluded that . . . Ms. Brasington[] fell into the severe range of the [*sic*] cognitive impairment. *Id.* at 16. This meant that Ms. Brasington suffered significant memory difficulties and that her judgment and decision[-]making skills would be fairly limited as well. She wouldn't have a full understanding of situations to make appropriate decisions. *Id.* at 16. . . .

The Commonwealth next called Steven Letzelter, Director of [the] Bureau of Revenue and Tax Claim[s], County of Erie. *Id.* at 32. He identified a tax payment made by [Burrows] on July 25, 2013[,] for $2,673.45. *Id.* at 33. This payment was made and the property assessed to Carmen Himes, 3002 Rose Avenue, Erie, PA[,] 16510. *Id.* at 34.

The Commonwealth then called John Hecker, a clinical psychologist to testify. *Id.* at 36. Dr. Hecker recited his [*curriculum vitae*] with no objection.

Dr. Hecker examined [Ms.] Brasington in June of 2013. *Id.* at 43. His opinion [was] that there was delirium, a very likely underlying dementia[,] and that it had been going on for some time. She was clearly not able . . . to make decisions for herself. *Id.* at 54. Dr. Hecker further opined that Ms. Brasington did not have the cognitive capacity to make [the decision to sign a power of attorney] on July 3, 2013[,] which would have been two (2) weeks after he saw her. *Id.* at 55-58.

Finally, the Commonwealth called [a]ttorney and [p]rofessor Ronald Costen.  *Id.* at 73.  He was offered and accepted by the [c]ourt as an expert in the field of law on the issue of [p]owers of [a]ttorney.

Professor Costen stated that before he can write a [p]ower of [a]ttorney he has to determine from a legal point of view that [the person conferring such power is not legally incapacitated]. *Id.* at 85.  Professor Costen then reviewed the documents relating to the Power of Attorney executed by [Ms.] Brasington and by [Burrows].  *Id.* at 86-87.

He then reviewed the opinion by Dr. Hecker after reviewing all the documents before arriving at an opinion.  *Id.* at 91.  Next he reviewed how the assets had been managed by [Burrows].  *Id.* at 92.  Finally, Professor Costen found that the Power of Attorney was ineffective in that it granted no authority to [Burrows] to do anything.  *Id.* at 100.  [Professor] Costen opined that [all] the transactions based upon his review were unlawful.  *Id.* at 101.  At the conclusion of Professor Costen's testimony the Commonwealth rested.

*Anders*/*Santiago* Brief at 6-11 (citations modified).

Following deliberations, the jury found Burrows guilty of counts two through four (theft by unlawful taking, exceeding $2,000); count five (theft by unlawful taking, between $200 and $2,000);[3] count seven (dealing in proceeds of unlawful activities), and count eight (misapplication of entrusted property and property of government or financial institutions).  *See* N.T.3 at 115-16.[4]  On January 29, 2015, the trial court sentenced Burrows to

---

[3]    Theft of greater than $2,000 constitutes a felony of the third degree. Theft of between $200 and $2,000 is a misdemeanor of the first degree. *See* 18 Pa.C.S. §§ 3903(a.1) and (b), respectively.

[4]    An earlier trial of Burrows resulted in a mistrial.  For the retrial now at issue, the Commonwealth withdrew counts one, six, and nine.

eighteen months to ten years' state incarceration for dealing in proceeds of unlawful activities, a sentence corresponding to the upper bound of the standard range for that offense. The court sentenced him on the remaining counts, the standard range for each of which included total confinement of varying durations, to concurrent periods of probation, the longest sentence among those being seven years. *See* N.T. Sentencing, 1/29/2015, at 22-24. Thus, Burrows' aggregate sentence was eighteen months to ten years' incarceration, to run concurrently with seven years' probation. The court also imposed restitution of $15,901.05 and costs of prosecution. On the same day, the trial court granted trial counsel's motion to withdraw as counsel for Burrows at Burrows' request.

On February 25, 2015, newly-appointed counsel timely filed a notice of appeal. On the same day, the trial court entered an order directing Burrows to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). In lieu of such a statement, on March 11, 2015, counsel filed a statement indicating that he intended to file an *Anders*/*Santiago* brief asserting the absence of any non-frivolous issues to pursue on appeal. On March 12, 2015, instead of filing an opinion pursuant to Rule 1925(a), the trial court entered an order determining that no opinion was required due to counsel's indication that he intended to proceed under *Anders*.

Because counsel for Burrows proceeds pursuant to *Anders* and *Santiago*, this Court first must pass upon counsel's petition to withdraw before reviewing the merits of the issues proposed by Burrows' counsel.

*Commonwealth v. Goodwin*, 928 A.2d 287, 290 (Pa. Super. 2007) (*en banc*). Prior to withdrawing as counsel under *Anders*, counsel must file a brief that meets the requirements established by our Supreme Court in *Santiago*. Pursuant thereto, the brief must provide the following information:

> (1) a summary of the procedural history and facts, with citations to the record;
>
> (2) reference to anything in the record that counsel believes arguably supports the appeal;
>
> (3) counsel's conclusion that the appeal is frivolous; and
>
> (4) counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361.

Counsel also must provide a copy of the *Anders* brief to his client. Attending the brief must be a letter that advises the client of his rights to "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the *Anders* brief." *Commonwealth v. Nischan*, 928 A.2d 349, 353 (Pa. Super. 2007); *see Commonwealth v. Daniels*, 999 A.2d 590, 594 (Pa. Super. 2010). Finally, to facilitate our review of counsel's satisfaction of his obligations, he must attach to his petition to withdraw the letter that he transmitted to his

client.  ***See Commonwealth v. Millisock***, 873 A.2d 748, 752 (Pa. Super. 2005).

Our review of counsel's petition to withdraw and the accompanying brief demonstrates that counsel has satisfied ***Santiago***'s requirements. Counsel has provided a procedural history detailing the events relevant to this appeal with appropriate citations to the record.  Brief for Burrows at 6-11.  Counsel also has articulated Burrows' potential arguments and has analyzed them with appropriate citations to the record and case law. Ultimately, counsel has concluded that Burrows has no non-frivolous issues to raise on appeal.

Counsel also has sent Burrows a letter informing him that he identified no meritorious issues to pursue on appeal; that counsel filed an application to withdraw as Burrows' counsel; and that Burrows was entitled to find new counsel or proceed *pro se*.  Counsel has attached the letter to his petition to withdraw, as required by ***Millisock***.  Accordingly, counsel has complied with ***Santiago***'s technical requirements.  See ***Millisock***, 873 A.2d at 751.

Before ruling upon counsel's motion to withdraw, however, we also must independently review the record, beginning with the claims Burrows wants this Court to review.  Counsel has identified three such issues:

1.    Did the Commonwealth present sufficient evidence to sustain Burrows' conviction[s] for . . . theft by unlawful taking?

2.    Did the Commonwealth present sufficient evidence to sustain Burrows' conviction for dealing in proceeds of unlawful activities?

3.    Did the Commonwealth present sufficient evidence to sustain Burrows' conviction for misapplication of entrusted property and property of government or financial institutions?

*Id.* at 5.

All of Burrows' potential issues concern the sufficiency of the evidence to sustain his convictions.  Our standard of review of challenges to the sufficiency of the evidence is well-settled:

The standard we apply . . . is whether viewing all the evidence admitted at trial in the light most favorable to the verdict[-] winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder['s]. . . .  [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011) (quoting *Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa. Super. 2005)).  Thus, we first must consider whether there is a non-frivolous challenge to the sufficiency of the evidence as to any of the counts in question.

A person is guilty of theft by unlawful taking "if he unlawfully takes, or exercises unlawful control over, moveable property of another with intent to

deprive him thereof." 18 Pa.C.S. § 3921(a). A theft by unlawful taking may occur when the offender misappropriates the assets of another party. ***See, e.g., Commonwealth v. McCullough***, 86 A.3d 896, 899 (Pa. Super. 2014).

As noted by the trial court during its charge to the jury, the four convictions for theft by unlawful taking concerned his alleged theft of $7,500, $3,500, $4,201.65, and $700 from Ms. Brasington. The first $7,000 took the form of a check written by Burrows from Ms. Brasington's account to Burrows' business, ABC Auto. $3,500 and $700 were transferred by separate checks that Burrows wrote to himself and deposited in an account in his name. And finally, Burrows personally withdrew $4,201.65 in cash from Ms. Brasington's account.

In the context of a sufficiency challenge, we must review the evidence in the light most favorable to the Commonwealth as the verdict-winner. At trial, Detective Reddinger reviewed bank records admitted into evidence. These included a canceled check for $7,500 drawn upon Ms. Brasington's First Niagara account and made out to ABC Auto, signed "David Burrows, Power of Attorney," and deposited in ABC Auto's PNC account. N.T.1 at 64, 72-73.[5] Detective Reddinger also identified a $3,500 check that was drawn from Ms. Brasington's First Niagara checking account, signed "David

_____

[5]   A representative of First Niagara bank confirmed that, at all relevant times, they had a form on file purporting to reflect that Burrows had power of attorney for Ms. Brasington's account. N.T.1 at 97-98.

Burrows, POA," and made out to Burrows. *Id.* at 64, 73-74. Detective Reddinger also identified a $700 check, signed "David Burrows POA" and made out to Burrows, along with a deposit ticket to Burrows' personal account for that check. *Id.* at 65, 75-76. Detective Reddinger also identified a checking withdrawal slip for a cash withdrawal of $4201.05 from Ms. Brasington's account, signed "David Burrows POA." *Id.* at 74-75. Each of these transactions happened within three weeks of Ms. Brasington's execution of the form purporting to grant Burrows power of attorney over her affairs on July 3, 2013.

Detective Reddinger testified that the deposited funds, $7,500 made out to ABC Auto, and $4,200 (*i.e.*, the $3,500 and $700 checks) made out to David Burrows, were deposited, respectively, in ABC Auto's PNC account and Burrows' PNC account.[6] From there, similar amounts were then transferred by check to one or more other accounts in Burrows' name. *Id.* at 76.[7] Detective Reddinger further testified that, in the course of his investigation, which included the execution of a search warrant upon Burrows' residence, where Ms. Brasington also resided toward the end of the time period during

_____

[6] A representative for PNC bank confirmed that Burrows had deposited the checks for $7,500 and $3,500 into his ABC Auto and personal PNC accounts, respectively. N.T.1 at 107-09. She was not asked about the $700 check.

[7] Numerous deposits into, and withdrawals from, Northwest Bank accounts in ABC Auto's and Burrows' names on or near the same dates were confirmed by a Northwest representative. N.T.1 at 116-19.

which these transactions occurred, he found no documents accounting for any of these transactions.

Carol McEwen, a social worker employed by Twinbrook skilled nursing home, testified that she conducted a mandatory cognitive assessment of Ms. Brasington on July 1, 2013, two days before Ms. Brasington executed the power of attorney. Ms. McEwen testified that Ms. Brasington had scored in the severe range of cognitive impairment. *See* N.T.2 at 12-16. Ms. McEwen further testified that this entailed "significant memory difficulties," and indicated that Ms. Brasington's "decision-making skills would be fairly limited as well, that she wouldn't have full understanding of situations to make appropriate decisions," including matters as straightforward as whether to wear boots on a snowy day and whether she had taken her medication. Her recommendation for someone so impaired, as it was for Ms. Brasington, would be to maintain twenty-four-hour supervision. *Id.* at 16-17. Ms. McEwen also testified that she had multiple conversations with Burrows, and explained to him the results of Ms. Brasington's cognitive exam and the recommended degree of supervision. *Id.* at 18-19.

John Hecker, Ph.D., a clinical psychologist whom the court admitted as an expert witness, testified to a clinical encounter with Ms. Brasington on June 19, 2013, at UPMC Hamot Medical Center. Ms. Brasington's attending physician asked him to conduct a psychological assessment after Ms. Brasington arrived at the hospital in a confused state. *Id.* at 44.

Dr. Hecker testified at length as to the results of a detailed assessment that he performed on that occasion. *Id.* at 45-54. At that time, he concluded that Ms. Brasington was suffering from acute delirium, with a high likelihood of underlying dementia. *Id.* at 53-54. He further testified that, at least on that occasion, "she was clearly not able to make decisions for herself." *Id.* at 54. He further testified that he did not believe that Ms. Brasington would have had the capacity knowingly to execute a power of attorney on July 3, 2013. *Id.* at 55, 58.

This evidence, viewed in the light most favorable to the Commonwealth, clearly sufficed to establish that, with regard to each of the transactions identified by Detective Reddinger, Burrows was guilty of theft by unlawful taking. The checks in question were executed pursuant to a power of attorney that Burrows obtained during a period when experts opined that Ms. Brasington lacked capacity to make responsible decisions regarding important affairs. They were made out either to Burrows or his business entity. They were deposited into Burrows' accounts and then transferred in whole or in part into other bank accounts in the name of Burrows or ABC Auto. No records existed to substantiate that the funds had been disposed of to Ms. Brasington's benefit. Given this evidence, we agree with counsel that no non-frivolous challenge to the sufficiency of the evidence to support the four asserted counts of theft by unlawful taking could be asserted.

We turn now to the remaining charges. Dealing in proceeds of illegal activities occurs when "the person conducts a financial transaction . . . with knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity, the person acts with the intent to promote the carrying on of the unlawful activity." 18 Pa.C.S. § 5111(a). A person commits the crime of misapplication of entrusted property and property of government or financial institutions when "he applies or disposes of property that has been entrusted to him as a fiduciary, or property of the government or of a financial institution, in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted." 18 Pa.C.S. § 4113(a).

We find that no non-frivolous challenge to the sufficiency of the evidence could be raised to either of these charges. The evidence recited above, which is by no means exhaustive of the inculpating evidence presented at trial, provided an ample evidentiary basis, both direct and circumstantial, upon which a jury reasonably could conclude beyond a reasonable doubt that Burrows committed each of these crimes. Consequently, based upon our independent review of the record, we agree with counsel that no non-frivolous challenge to the sufficiency of the evidence to sustain any of the charges of which Burrows was convicted could be raised on appeal. Furthermore, in reviewing the trial record, we observe no other non-frivolous issues that Burrows could raise on appeal.

Judgment of sentence affirmed. Petition to withdraw as counsel granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/12/2015